1

2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

3

4   ALEXANDER B. ARIZMENDI,                    Case No.  13-cv-04716-YGR (PR)

5              Plaintiff,                      **ORDER GRANTING DEFENDANTS'**
                                               **MOTION FOR SUMMARY**
6        v.                                    **JUDGMENT; AND ADDRESSING**
                                               **PLAINTIFF'S PENDING MOTIONS**
7   SERGEANT C. SEMAN, et al.,

8              Defendants.

9                            **INTRODUCTION**

10       Plaintiff Alexander B. Arizmendi, a state prisoner, filed a civil rights complaint pursuant to

11   42 U.S.C. § 1983.  Dkt. 1.  Thereafter, Plaintiff filed an amended complaint, alleging violations

12   related to his January 12, 2013 placement in administrative segregation ("Ad Seg")[1] at San

13   Quentin State Prison ("SQSP").[2]  Dkt. 9 at 4.  Plaintiff raised the following claims: (1) retaliation

14   for (a) exercising his Fifth Amendment right to remain silent and (b) "filing" a grievance;

15   (2) violation of due process rights and corruption of the grievance process; and (3) emotional

16   distress and mental torture for wrongful placement in solitary confinement.[3]  Dkt. 9 at 3, 4.[4]  The

17   Order of Service indicates that the aforementioned claims were found to be cognizable as

18

19

20       [1] "Administrative segregation" is a catch-all phrase for any form of non-punitive
     segregation.  For example, prisoners may be segregated to protect them from other inmates, to
21   protect other inmates from the segregated prisoner, or pending investigation of disciplinary
     charges, transfer, or re-classification.  *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983), *abrogated*
22   *in part on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995).
         [2] Plaintiff's last known address is at SQSP.  Dkt. 59-1 at 1.  However, according to the
23   inmate locator program on the California Department of Corrections and Rehabilitation ("CDCR")
     website (http://inmatelocator.cdcr.ca.gov/default.aspx), Plaintiff is currently housed at the
24   California Substance Abuse Treatment Facility and State Prison in Corcoran.  The Court directs
     the Clerk of the Court send copies of this Order to Plaintiff at both locations.
25       [3] Plaintiff's amended complaint also alleged a *Monell* claim for failure to train and
     supervise properly.  Dkt. 9 at 3.  The Court dismissed it for failure to state a claim "because there
26   [was] no allegation that a local government or municipality, who are 'persons' subject to liability
     under 42 U.S.C. § 1983, had an official policy or custom that caused a constitutional tort."  Dkt.
27   12 at 2 (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978)).
         [4] Page number citations refer to those assigned by the Court's electronic case management
28   filing system and not those assigned by Plaintiff.

United States District Court
Northern District of California

United States District Court
Northern District of California

violations of Plaintiff's constitutional rights,[5] and service was ordered on the following Defendants at SQSP: Sergeant Seman, Lieutenant Arnold, Captain Erickson, Assistant Warden Rodriguez, Warden R. Chappell, and Appeals Coordinators S. Hay and Gorbea-Baxter.  Dkt. 12 at 2-3.

Before the Court is Defendants' motion for summary judgment.  Dkt. 44.  They argue that SQSP personnel had valid penological[6] reasons for placing Plaintiff in Ad Seg, including concern for his safety.  *Id.* at 11.  Defendants also assert that Plaintiff's placement in Ad Seg did not constitute cruel or unusual punishment and that prison staff advised Plaintiff of the reasons for his placement in Ad Seg in accordance with due process.  Dkt. 44 at 14-16.  They argue further that Plaintiff has not shown a causal connection between several named Defendants and the alleged wrongdoing.  *Id.* at 17-18.  Finally, Defendants argue that they are entitled to qualified immunity. *Id.* at 18-19.

Plaintiff opposes the motion for summary judgment.  Dkt. 54.  Additionally, he has filed motions for reconsideration and appointment of counsel.  Dkts. 27, 47.

For the reasons outlined below, the Court DENIES Plaintiff's motions for reconsideration and appointment of counsel, and GRANTS Defendants' motion for summary judgment.

## PRELIMINARY ISSUES

### I.   PLAINTIFF'S MOTION FOR RECONSIDERATION

Before addressing Plaintiff's motion for reconsideration, the Court shall first provide a

---

[5] The Order of Service specifically indicates that Plaintiff had alleged cognizable claims of violations under his "Fourth, Fifth and Eighth Amendment rights."  Dkt. 12 at 2.  This Court notes, however, that none of Plaintiff's claims challenge the validity of a search or seizure under the Fourth Amendment.  *See id.*  The first claim relates to Plaintiff's Fifth Amendment rights, and the third claim alleges an Eighth Amendment violation.  *See id.*  The only remaining claim alleges a violation of Plaintiff's due process rights.  *See id.*  Due process violations perpetrated by state actors typically involve the Fourteenth Amendment.  *See* U.S. Const. amend. XIV § 1. Accordingly, the Court finds that the Order of Service inadvertently labeled Plaintiff's second claim as a "Fourth Amendment" violation.  Dkt. 12 at 2.  The Court now remedies this oversight and considers Plaintiff's second claim a cognizable *Fourteenth Amendment* violation.  The Court further notes that Defendants similarly proceeded on the basis that the second claim implicates a Fourteenth Amendment violation, and they have briefed their dispositive motion to challenge such a claim.

[6] Penological means related to the "study of penal institutions, crime prevention, and the punishment and rehabilitation of criminals, including the art of fitting the right treatment to an offender."  Black's Law Dictionary (10th ed. 2014).

brief procedural background of the instant action.

Plaintiff's original complaint alleged claims based on two separate incidents that took place at SQSP. Dkt. 1 at 3. The first incident took place on January 11, 2013 and involved, among others, SQSP Correctional Officer Clain. *Id.* at 4. The second incident took place on January 12, 2013 and involved Defendant Seman and, eventually, all the other Defendants named in the present action. *Id.* at 5-6.

On April 8, 2014, the Magistrate Judge Howard R. Lloyd conducted the initial review of Plaintiff's original complaint and dismissed it with leave to amend because it alleged two separate incidents. Dkt. 6. Magistrate Judge Lloyd instructed Plaintiff that his amended complaint must relate to only one incident. *Id.* at 3. Plaintiff thereafter filed *two* amended complaints, one for each incident described in his original complaint. Dkts. 8, 9.

On August 15, 2014, Magistrate Judge Lloyd reviewed the amended complaint, but focused only on the amended complaint (dkt. 9) that described the January 12, 2013 incident. Dkt. 12. Magistrate Judge Lloyd ordered service on the aforementioned named Defendants, but dismissed Correctional Officer Clain after finding that there were no claims alleged against him in the amended complaint.[7] *Id.* at 2, 3. After the amended complaint was served, this action was reassigned to the undersigned judge. Dkt. 32.

Plaintiff now moves for reconsideration of the Court's August 15, 2014 Order dismissing Correctional Officer Clain. Dkt. 27. Plaintiff requests that all claims involving the two separate incidents be "consolidated as initially proposed." Dkt. 43 at 3. Plaintiff supports his motion by alleging that the Court had instructed him "to either dismiss one complaint or to file two separate ones." *Id.* at 2. Plaintiff affirms that he filed "two separate complaints under the same case number, marked as amended as instructed by the Court." *Id.* Apparently, Plaintiff construed the Court's April 8, 2014 Order dismissing Plaintiff's original complaint and granting leave to amend

---

[7] While there were no claims alleged against Correctional Officer Clain in the amended complaint reviewed by Magistrate Judge Lloyd (dkt. 9), Plaintiff did allege claims against Correctional Officer Clain in the remaining unscreened amended complaint (dkt. 8). The dismissal of Correctional Officer Clain shows that Magistrate Judge Lloyd intended to designate only one of the amended complaints (dkt. 9) as the operative complaint in this action.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    (dkt. 6) as giving him the option of filing two separate complaints within the same action.

2    Plaintiff suggests that by dismissing Correctional Officer Clain, the Court "inadvertently [sic]

3    omitted a matter" it intended to include. Dkt. 43 at 2-3. Plaintiff maintains that both incidents are

4    "closely related" and cites judicial efficiency among the reasons to consolidate his claims. *Id.* at

5    2-4. Meanwhile, Defendants oppose Plaintiff's motion for reconsideration. They argue that the

6    dismissal of Correctional Officer Clain[8] was proper, and that reconsideration should be denied

7    because Plaintiff offers no "newly discovered evidence," nor cites to any "intervening changes in

8    controlling law." Dkt. 50 at 2-3.

9           The Court's April 8, 2014 Order made clear that Plaintiff cannot file claims from multiple

10   incidents in one complaint. Dkt. 6 at 3. The Court noted that such claims "must be alleged in

11   separate complaints filed in *separate actions*." *Id.* (emphasis added). Plaintiff appears to have

12   misunderstood the language requiring separate complaints in separate actions, and instead

13   attempted to file two complaints in the same action. Although the Court inadvertently failed to

14   address this misunderstanding in its Order of Service (dkt. 12), it nevertheless stands by its prior

15   directive that separate complaints must be filed in separate actions.

16          Accordingly, the Court DENIES Plaintiff's motion for reconsideration of the Court's

17   August 15, 2014 Order dismissing Correctional Officer Clain. Dkt. 27. Should Plaintiff wish to

18   pursue his claims stemming from the January 11, 2013 incident involving Correctional Officer

19   Clain, he must file a separate complaint alleging such claims in a new action. To be clear, this

20   means that Plaintiff, if he wishes, must submit a complaint naming Correctional Officer Clain as a

21   *separate* action. Plaintiff may not file such a complaint under the above-referenced case number

22   for the instant action and, instead, he must obtain a new case number from the Clerk.[9]

23   **II.     PLAINTIFF'S MOTION FOR APPOINTMENT OF COUNSEL**

24          Plaintiff informs the Court that due to an unrelated more recent placement in Ad Seg, he

25   _____

26          [8] In their opposition, Defendants refer to the dismissed defendant as Correctional Officer
     "Cain." Dkt. 44 at 7. To avoid confusion and to be consistent with its previously-filed orders, the
27   Court refers to this dismissed defendant as Correctional Officer "Clain."
            [9] If Plaintiff files a new action, then it will be assigned to the undersigned Judge. If the
28   new action is not automatically assigned to the undersigned Judge, then it will be reassigned to
     correct such an error.

                                                    4

1   "is essentially handicapped" and "unable to litigate his case." Dkt. 47. He emphasizes that he

2   does not have access to his legal documents or to the law library. *Id.*; Dkt. 54 at 11-12. Plaintiff

3   argues these obstacles form "exceptional" and "extraordinary circumstances" that warrant

4   appointment of counsel. Dkt. 54 at 12.

5       More specifically, Plaintiff complains that his presence in Ad Seg has rendered him

6   "unable to enter a properly drafted opposition to summary judgment."[10] Dkt. 59 at 1-3. Plaintiff

7   claims he has "merely . . . tried to show the Court that [his] claim has merit in support [of]

8   Appointment of Counsel." *Id.* at 3. Additionally, Plaintiff suggests that defendants are "using his

9   legal handicap as a tactic to get him to default his findings or legal papers."[11] Dkt. 54 at 11-12,

10  15; *see also* Dkt. 47, Dkt. 59 at 1, 2. Finally, Plaintiff asserts that because "several

11  issues/differences [are] in dispute," his "inability to [conduct] legal research and [] back up his

12  arguments with [] case law" compels the appointment of counsel. Dkt. 54 at 12.

13      The decision to request counsel to represent an indigent litigant under section 1915 is

14  within "the sound discretion of the trial court and is granted only in exceptional circumstances."

15  *Franklin v. Murphy*, 745 F.2d 1221, 1236 (9th Cir. 1984). A finding of the "exceptional

16  circumstances" requires an evaluation of the likelihood of the plaintiff's success on the merits and

17  an evaluation of the plaintiff's ability to articulate his claims *pro se* in light of the complexity of

18  the legal issues involved. *See Agyeman v. Corrections Corp. of America*, 390 F.3d 1101, 1103

19  (9th Cir. 2004); *Terrell v. Brewer*, 935 F.2d 1015, 1017 (9th Cir. 1991); *Wilborn v. Escalderon*,

20

21      [10] The Court notes that Plaintiff has since filed his opposition to Defendants' motion for
    summary judgment. Dkt. 54. The Court further notes that Plaintiff has not filed any discovery
22  requests in this matter. Moreover, Plaintiff never alleged that he did not have sufficient
    opportunity to discover affirmative evidence necessary to oppose the motion; therefore, the Court
23  need not construe his allegations as a request for a continuance under Rule 56(d) of the Federal
    Rules of Civil Procedure. *See* Fed. R. Civ. P. 56(d) (Rule 56(d) provides that a court may deny a
24  summary judgment motion and permit the opposing party to conduct discovery where it appears
    that the opposing party, in the absence of such discovery, is unable to present facts essential to
25  opposing the motion.).
    [11] The Court construes Plaintiff's argument here as support for his motion for appointment
26  of counsel, and not as a separate retaliation claim for filing the instant lawsuit. The Court
    emphasizes that the Order of Service referenced only a retaliation claim arising from Plaintiff's
27  encounter with Defendant Seman on January 12, 2013. *See* Dkt. 12 at 2. To the extent that
    Plaintiff wishes to pursue a claim of retaliation for filing the instant section 1983 action, he must
28  allege such a claim in a separate action.

United States District Court
Northern District of California

789 F.2d 1328, 1331 (9th Cir. 1986).  Both of these factors must be viewed together before reaching a decision on a request for counsel under section 1915.  *See id.*

Here, the Court finds that Plaintiff has adequately articulated his claims and, as discussed below, Plaintiff is unlikely to succeed on the merits.  Therefore, the Court DENIES Plaintiff's motion for appointment of counsel.  Dkt. 47.

## MOTION FOR SUMMARY JUDGMENT

## I.     FACTUAL BACKGROUND

### A.     Ad Seg Placement

Plaintiff claims that on the morning of January 12, 2013, he "had been in such a hurry to get up and get ready for breakfast that he fell from his top bunk bed and hit himself on the face against his locker then fell on his back."  Dkt. 9 at 4.  Plaintiff suffered a bloody nose and bruises consistent with a broken nose.  *Id.*

After alerting a correctional officer, Plaintiff was brought to a clinic, where he encountered Defendant Seman.  *Id.*  Plaintiff contends that Defendant Seman "confronted" him by asking if he "was the guy who like[d] to give trouble and file claims against [correctional officers]."  *Id.*  Plaintiff believes that Defendant Seman was referring to the aforementioned incident involving Correctional Officer Clain that occurred the day before, January 11, 2013.  *Id.*

Plaintiff informed Defendant Seman that he suffered the injuries by falling out of his bunk bed.  Seman Decl., Dkt. 44-2 at 2.  Based on prior experience, however, Defendant Seman believed Plaintiff "sustained these injuries from being battered by another person."[12]  *Id.*  Because Defendant Seman suspected Plaintiff was the "victim of an assault," he believed "the only means to eliminate the possibility of further physical harm or danger . . . was to remove [Plaintiff] from his current housing unit and place him in Ad Seg for his own safety, and the safety o[f] other inmates and staff members, in accordance with prison policy."  *Id.* at 3.

Plaintiff claims that Defendant Seman warned him that "he would be placed in [Ad Seg]

---

[12] According to Plaintiff, the nurse who examined him collaborated with Defendant Seman to falsify a document that stated Plaintiff had marks on his hands consistent with fighting.  Dkt. 54 at 2; *see also* Larsen Decl., Dkt. 44-4 at 2; Dkt. 44-5 at 2.  However, Plaintiff did not name the nurse as a defendant in this action.

until he told [them] whom he had fought with [sic]." Dkt. 9 at 4.  Plaintiff argues it was "absurd" for Defendant Seman to demand such information because there was no fight and "hypothetically speaking, had there been a fight [Plaintiff] could not talk about it."  *Id.*  Plaintiff claims that his transfer to Ad Seg was "a retaliatory measure meant to punish [him] for filing a claim on [the] unrelated incident" involving Correctional Officer Clain.  *Id.*  In support of his argument, Plaintiff alleges that Defendant Seman stated "I'll make an example of you."  *Id.* at 4-5.

Defendant Seman, on the other hand, maintains that he did not retaliate against Plaintiff. Seman Decl., Dkt. 44-2 at 4.  Defendant Seman declares that he was "unaware of the inmate appeal [Plaintiff] is referring to" and that he was concerned for "the safety and security of [Plaintiff], other inmates, and staff."  *Id.*  Specifically, Defendant Seman claims that prison staff conducted an initial inspection, but "could not determine for certain whether the person who battered [Plaintiff] would try and batter him again, possibly inflicting serious bodily injury or death."  *Id.* at 2.  Defendant Seman states as follows:

> I ordered the program to be shut down and assigned all the inmates to their respective bunks.  All activity in the housing unit stopped and each inmate stood at their bunks so that an inspection of each inmate could be completed.  Staff inspected each inmate's knuckle and upper-chest areas for signs of a recent fist-fight such as blood or redness.  The inspection did not reveal the inmate that could have battered Arizmendi.  Arizmendi and the other inmates did not identify the person who battered Arizmendi.  Without being able to identify the person who had battered Arizmendi, I was unable to evaluate the threat of future violence between Arizmendi and the other inmate, or inmates.

*Id.*  After meeting with Plaintiff, Defendant Seman recommended that Plaintiff be moved to Ad Seg.  *Id.* at 3.  Plaintiff was then placed in a holding cell.  *Id.*  Investigative Service Unit Correctional Officer Ramirez attempted to take photographs of Plaintiff's injuries.  *Id.*  Plaintiff looked away from the camera and stepped away from Officer Ramirez.  *Id.*  Defendant Seman ordered Plaintiff to be handcuffed, and Correctional Officer Guilbeaux prevented Plaintiff from

United States District Court
Northern District of California

1  stepping away from the camera while Officer Ramirez took photographs of Plaintiff's injuries.[13]

2  *Id.*  Plaintiff asserts that no photographs were taken of his hands.  Dkt. 54 at 2-3.  Even though

3  Defendants claimed Plaintiff had marks on his hands consistent with fighting, he maintains that no

4  such marks existed.  *Id.*  After the photographs were taken, Plaintiff was returned to the holding

5  cell.  Seman Decl., Dkt. 44-2 at 3.  Lieutenant Lee later approved Defendant Seman's

6  recommendation, and Plaintiff was transferred to Ad Seg.  *Id.*

7          On January 14, 2013, Defendant Captain Erickson met with Plaintiff.  Dkt. 9 at 5; Erickson

8  Decl., Dkt. 44-3 at 2.  Defendant Erickson informed Plaintiff that he was placed in Ad Seg

9  "because he had physical injuries indicating that he had been physically abused by another

10  inmate."  Erickson Decl., Dkt. 44-3 at 2.  Plaintiff told Defendant Erickson that he sustained

11  injuries by falling out of his bunk bed, but Defendant Erickson did not believe this explanation.

12  *Id.*  Instead, Defendant Erickson agreed with Defendant Seman that the injuries were "likely

13  sustained from being battered by another person who had not yet been identified."  *Id.*  According

14  to Plaintiff, Defendant Erickson said "'you better tell us whom did you fight with [sic], get your

15  115 [rules violation report] and you'll be outta here soon, otherwise you could potentially be here

16  indefinitely on 90 day investigative intervals.'"  Dkt. 9 at 5.  Meanwhile, Defendant Erickson

17  claims that in order to "minimize the threat of further violence or injury," he approved Plaintiff's

18  placement in Ad Seg until Plaintiff could appear before the Institutional Classification Committee

19  ("ICC").[14]  Erickson Decl., Dkt. 44-3 at 3.  Defendant Erickson emphasizes that Plaintiff "was not

20  placed in Ad Seg as a disciplinary measure," but rather "for his own safety and well-being until

21  the other inmate could be identified."  *Id.*

22

23

24          [13] On July 17, 2015, the Court ordered Defendants to produce the photographs in question.
    Dkt. 62.  On July 22, 2015, Defendants responded by filing a declaration from Correctional
25  Officer Ramirez stating that the photographs cannot be produced because they "were lost during a
    computer upgrade and have not been recovered."  Dkt. 63 at 2.  Nevertheless, the Court finds that
26  it need not view these photographs in order to resolve the pending motion for summary judgment.
          [14] Under California Code of Regulations, title 15, Section 3335(d), an inmate's placement
27  in Ad Seg must be reviewed by the ICC within ten days of his or her placement in Ad Seg.
    Erickson Decl., Dkt. 44-3 at 2; Cal. Code Regs., tit. 15 § 3335(d).  The ICC has the authority to
28  keep the inmate in Ad Seg or release the inmate to general population.  Erickson Decl., Dkt. 44-3
    at 2.

United States District Court
Northern District of California

On January 17, 2013, Plaintiff appeared before the ICC for a review of his placement in Ad Seg. Dkt. 44-7 at 7. The ICC decided to retain Plaintiff in Ad Seg for sixty days, pending the investigation into the safety concerns related to his injuries. *Id.* Plaintiff alleges that he "was not afforded a fair hearing" and "he was yelled at by both" Defendants Erickson and Rodriguez during the January 17, 2013 hearing.[15] Dkt. 9 at 5. Plaintiff also objects to the summary of the hearing (dkt. 44-7 at 7), which states that he "was an active participant in the hearing" and he "was in agreement with the committee decision." Dkt. 54 at 4. Plaintiff maintains he was not in agreement with the committee and he was not given a copy of the decision, which he needed to appeal." *Id.*; *see* Cal. Code Regs., tit. 15 § 3339(b)(5) (requiring that inmates receive a copy of their segregated housing order).

On February 28, 2013, Plaintiff appeared before the ICC, which elected to retain him in Ad Seg for another sixty days "pending unit investigation." Dkt. 44-7 at 8. Plaintiff claims he was told "you are not getting outta here until you confess." Dkt. 9 at 5. He further alleges that investigations are normally completed "within a couple of hours," but the committee told him "'we don't care about investigation, you have to talk.'" *Id.* Plaintiff asserts that "no investigation took place." Dkt. 59 at 3; Dkt. 54 at 13. Defendant Rodriguez counters that "investigations of this nature take time because inmates are not generally inclined to cooperate with an investigation immediately after an incident occurs—if at all." Rodriguez Decl., Dkt. 44-1 at 2. Plaintiff again objects to the hearing summary (dkt. 44-7 at 8), emphasizes he was not in agreement with the decision, and complains that he did not receive a copy of the decision. Dkt. 54 at 4.

On March 2, 2013, Plaintiff claims he met with Lieutenant Lee. Dkt. 9 at 6; Dkt. 54 at 5.

---

[15] In his amended complaint, Plaintiff names as a defendant one assistant warden, namely "Assistant Warden W. Rodriguez," who has responded thereto. Dkt. 9 at 2; Dkt. 42. The only allegation in the amended complaint to an "Assistant Warden" is one where Plaintiff alleges that the "Assistant Warden" yelled at him. *Id.* at 5. However, the amended complaint refers to the "Assistant Warden" as "Ramirez," who was not otherwise named as a defendant, nor has such a person appeared. Consistent with the naming of "Assistant Warden W. Rodriguez" as a defendant, Plaintiff states in his opposition that Defendant "W. Rodriguez" yelled at him and maintains that this Defendant was present at the hearing. Dkt. 54 at 3. Because "Assistant Warden W. Rodriguez" is a named defendant who has been served, and "Assistant Warden Ramirez" is not, the Court believes that Plaintiff's sole reference to "Ramirez" on his amended complaint was a clerical error. The Court thus proceeds on the basis that Plaintiff alleges Defendant Rodriguez yelled at him during the January 17, 2013 Ad Seg hearing.

United States District Court
Northern District of California

1    Plaintiff states Lieutenant Lee "was under the impression that [Plaintiff] was there voluntarily, as

2    it was what the 114-D form he signed implied."[16]  Dkt. 54 at 5.  Plaintiff believes that Lieutenant

3    Lee was "deceived by Defendant Seman."  *Id.*  According to Plaintiff, Lieutenant Lee clarified that

4    "unless [Plaintiff] had safety concerns" and "voluntarily wanted to be segregated," he should be

5    released from Ad Seg.  *Id.*  Plaintiff states that Lieutenant Lee "closed the investigation and told

6    Plaintiff that he cleared him to go back" to general population.  Dkt. 9 at 6.  Plaintiff does not file

7    any supporting evidence showing that Lieutenant Lee cleared him for release from Ad Seg, and

8    nothing in the record corroborates such a claim.

9         On March 24, 2013, Defendant Seman met with Plaintiff, who was still being held in Ad

10   Seg.  Seman Decl., Dkt. 44-2 at 4.  According to Plaintiff, Defendant Seman warned Plaintiff this

11   was his "'last chance to talk.'"  Dkt. 9 at 7.  Plaintiff contends that he told Defendant Seman about

12   his conversation with Lieutenant Lee,[17] provided a copy of a habeas petition he filed in Marin

13   County Superior Court (about his Ad Seg placement), and explained that he was filing a section

14   1983 complaint.  Dkt. 54 at 5-6.  In response, Plaintiff claims that Defendant Seman told Plaintiff

15   "to forget about everything" and "that there could be consequences for 'playing rough.'"  Dkt. 9 at

16   7; Dkt. 54 at 6.  Meanwhile, Defendant Seman claims that during the March 24, 2013 meeting,

17   Plaintiff expressed that he had no safety concerns about returning to general population.  *Id.*; Dkt.

18   44-7 at 9.  After Defendant Seman verified with general population inmates that "there were no

19   safety concerns or threat of retaliation," he recommended that Plaintiff be released from Ad Seg

20   and returned to his regular housing unit.  *Id.*; Dkt. 44-7 at 10.

21        On March 28, 2013, Plaintiff appeared once more before the ICC, and the committee

22   followed Defendant Seman's recommendation to release Plaintiff to general population.  Dkt. 44-7

23   at 12.  Plaintiff claims that during the two and a half months he spent in Ad Seg, Defendants

24

25        [16] The Court has examined the CDCR 114-D form or "Administrative Segregation Unit
     Placement Notice" signed by Lieutenant Lee.  Dkt. 44-7 at 4.  Nowhere in this document does it
26   indicate that Plaintiff voluntarily agreed to be placed in Ad Seg.
         [17] Plaintiff states that he told Defendant Seman "about his conversation with Lieutenant
27   Lee and the fact that [Lieutenant Lee] now knows [he] wasn't in Ad Seg voluntarily."  Dkt. 54 at
     5.  It is unclear whether Plaintiff informed Defendant Seman that Lieutenant Lee cleared Plaintiff
28   for release.  Furthermore, in his declaration, Defendant Seman does not acknowledge that Plaintiff
     informed him that Lieutenant Lee cleared Plaintiff for release.  Dkt. 44-2 at 4.

Seman and Erickson repeatedly asked Plaintiff "to just confess, get [his rule violation report] for fighting, [and] take the penalty that would be the only way out."  Dkt. 54 at 7.

### B.   602 Inmate Appeals

During his stay in Ad Seg, Plaintiff tried "to use the inmate grievance process or 602 [appeal]" to challenge his Ad Seg placement. Dkt. 9 at 5.  Plaintiff claims that "for nearly two months[,] he kept getting rejected for . . . lack of paperwork that he was never issued such as Institutional Committee Findings, rules violation report among others which . . . was done in an effort to block his access to court." *Id.* at 5-6.  Still, Plaintiff acknowledges that his "602 [appeal] finally made it through the screening process" and he had a hearing on March 22, 2013. *Id.* at 6.  Plaintiff, however, was "baffled [and] astonished beyond belief" that Defendant Erickson adjudicated the hearing because Plaintiff had brought the 602 appeal against Defendant Erickson. *Id.*  Plaintiff asserts this is a "clear conflict of interest" in violation of state and federal law. *Id.*; Dkt. 54 at 5.  Plaintiff complains that his 602 appeal was "denied and mishandled," and that correctional officers and staff perjured information.  Dkt. 9 at 7-8.  He argues that correctional officers "confine inmates in torturous conditions without any fear of reprimand nor accountability." *Id.* at 8.

The record shows that the 602 appeal that Plaintiff claims made it through the screening process was log no. CSQ-B-13-00521, which was filed on February 6, 2013 and challenged his Ad Seg placement.  Dkt. 1-1 at 25.  This 602 appeal was bypassed at the First Level of Review. *Id.*

Contrary to Plaintiff's claim that Defendant Erickson adjudicated the 602 "hearing" on March 22, 2013, the record shows that Defendant Erickson *interviewed* Plaintiff regarding log no. CSQ-B-13-00521 on that date. *Id.* at 26, 30.  Nothing in the record indicates that Defendant Erickson conducted a formal hearing or that he ruled on log no. CSQ-B-13-00521.  Instead, on April 23, 2013, Warden Kevin R. Chappell reviewed log no. CSQ-B-13-00521 at the Second Level of Review ("SLR"). *Id.* at 29-30.  Warden Chappell denied the appeal, stating as follows:

> On January 12, 2013, Appellant was placed in ASU [Administrative Segregation Unit] based upon injuries consistent with being a victim of a battery.  There was no punitive action taken against Appellant, as his placement in ASU was for his own protection for possible SAFETY CONCENRS and VICTIMIZATION CONCENRS based

1

upon evidence documented in the CDCR 7219 authored on 1/12/2013 by LVN J. Larsen.

2

3

4

5

6

7

The Appellant's claim that he had no marks consistent with fighting is not consistent with this document, which itemizes abrasions/scratches, active bleeding, bruising/discolored area and reddened area to Appellant's face, chest and back. Moreover, Appellant has noted [next] to his hands & knuckles "Reddened area." There marks are consistent with participation in a fight or as the victim of a battery. Appellant initially claims that he fell off his bunk, he concluded his statement with, "I don't want to point the finger." This statement implies that Appellant knows the circumstances and he is withholding information.

8

9

On 3/22/2013 Correctional Captain P. J. Erickson interviewed the appellant concerning this issue, while Appellant was housed in Carson Section ASU. The appellant reiterated his allegations; however he provided no new information relevant to this appeal.

10

11

12

13

14

15

16

Subsequent to his initial appeal, the appellant was brought to ICC on two separate occasions: 2/28/2013, where Appellant was retained for an additional 60 days (which was approved by CSR [Classification Staff Representative] on 3/12/2013 thru 4/29/2013); and again the appellant was brought to ICC on 3/28/2013 where he was released from ASU Back to General Population, based upon a unit investigation which concluded on 3/24/2013 per 128B authored by Correctional Sergeant C. Seman. The investigation did not establish the circumstances of the event which caused the injury, but concluded that the Appellant did not have any safety concerns in the General Population at San Quentin, with no reason to retain in ASU. As far as disciplinary action to be taken against those involved, there is no evidence to support any allegation of staff misconduct.

17

*Id.* at 29-30.

18

Plaintiff appealed the SLR denial to the Third Level of Review ("TLR"). *Id.* at 26, 28. On

19

August 1, 2013, Appeals Examiner K. Pool examined Warden Chappell's SLR denial, and

20

determined that no relief was warranted at the TLR. *Id.* at 23-24. Appeals Examiner Pool thus

21

denied log no. CSQ-B-13-00521 at the TLR, stating:

22

23

24

25

26

27

28

The documentation and arguments are persuasive that the appellant has failed to support his appeal issues with sufficient evidence or facts to warrant modification of the SLR. The examiner notes that pursuant to California Code of Regulations, Title 15, Section (CCR) 3335(a) "When an inmate's presence in an institution's general inmate population presents an immediate threat to the safety of the inmate or others, endangers institution's security or jeopardizes the integrity of an investigation of an alleged serious misconduct or criminal activity, the inmate shall be immediately removed from general population and be placed in administrative segregation." The appellant was discovered to have received injuries consistent with possibly being the victim of a battery or participated in an altercation; therefore, the appellant was rehoused in the SC ASU on

January 12, 2013. The appellant's case factors were appropriately reviewed by the SQ ASU ICC, which resulted in him being retained in the ASU pending completion of an investigation. The examiner notes the appellant dialed to provide any information or evidence that staff or the ASU ICC failed to adhere to departmental policies and regulations. Therefore, no relief is warranted at the Third Level of Review.

*Id.* at 24.

### C. Conditions in Ad Seg

Plaintiff alleges that because of his placement in Ad Seg, he "was irreparably harmed by [] brutalizing and torture and was left suffering from mental disorder." *Id.* First, Plaintiff claims that on January 12, 2013, he was initially placed in the Inmate Adjustment Center ("I.A.C."), which he describes as "an even rougher version of Ad Seg." Dkt. 54 at 7. Plaintiff claims I.A.C. houses death row inmates who have committed crimes while in prison, validated gang members, and inmates "deemed extremely dangerous and incorrigible." *Id.* He describes his cell in I.A.C. as a "cold concrete box, approximately 6 x 10 feet, with a toilet and concrete bed." *Id.* He claims he was given a canvas jumpsuit, but denied shoes or bedding even though "it was very cold." *Id.* He states that there were "no windows and the lights [were] on 24 hours a day," which means "there is now way to know if it's day or night." *Id.* He complains that meals were served only twice a day, and food would only be given if he was standing by his door at mealtime. *Id.* Because Plaintiff never knew the time of day, he claims he "sometimes stood by the door for hours waiting and sometimes [he] would be sleeping when the meals came." *Id.* He claims he was not given food on several occasions and that he was also denied showers for "6 or 7 days" for not standing by the door at the right time. *Id.* at 7-8. Plaintiff states he remained in I.A.C. from January 12, 2013 until January 18, 2013, at which point he was given shoes and transferred to "regular" Ad Seg. *Id.* at 8.

Once in "regular" Ad Seg, Plaintiff claims he was able to tell day from night and receive his allowance of two "cold, congealed meals" per day. *Id.* Plaintiff notes his experience consisted of twenty-four hours a day in a 4 x 11 cell "with the exception of a 5 minute shower 3 days a week." *Id.* After about five weeks, Plaintiff claims he received "some of [his] property, only basic items such as soap, toothpaste, and a few edible items." *Id.* He alleges he was not permitted

13

United States District Court
Northern District of California

1  television, radio, books, or personal pictures.  *Id.*  He states that he was given only minimal access

2  to the law library, even though he had a pending habeas corpus petition.  *Id.* at 8-9.  Plaintiff also

3  complains that staff "walk[ed] around every 15 minutes or so banging on the doors" with a device

4  that made "an ear splitting high pitch sound."  *Id.* at 9.  According to Plaintiff, staff justified this

5  action as an "anti-suicide measure," but the "end result amount[ed] to torture by sleep

6  deprivation."  *Id.*

7        Plaintiff contends that the restrictions he suffered in Ad Seg violate Section 3343 of Title

8  15 of the California Code of Regulations, which requires that living conditions of segregated

9  housing "approximate those of the general population."  *Id.*  Specifically, Plaintiff claims he

10  received "fungal infections caused by showering in an unsanitary bathroom without slippers,

11  which later [spread] towards [his] face."  *Id.* at 11.  Additionally, he claims that staff denied him

12  hygiene products, rendering him unable to brush his teeth (for approximately 50 days) or floss (for

13  75 days), and thus damaging his teeth.  *Id.*  Finally, Plaintiff alleges that he "suffered severe

14  mental impairment and sleep deprivation induced hallucinations, which sometimes made suicide

15  an enticing and viable option."  *Id.*  In sum, Plaintiff feels "Ad Seg is a completely different life"

16  than general population, one which "inflicted atypical and significant hardship."  *Id.* at 10.

17        Defendants respond that prison regulations require that "while in [Ad Seg], Plaintiff

18  receives at least ten hours of exercise per week" and "the same food that general-population

19  inmates eat."  Dkt. 44 at 16 (citing Maiorino Decl., Ex. B: SQSP Adjustment Center, Ad Seg

20  Inmate Orientation Handbook (March 2013); Cal. Code Regs., tit. 15 § 3343 (d)-(k)).  Defendants

21  also claim that Plaintiff receives "access to the same publications and reading materials as"

22  general population, and a television or radio.  *Id.*  Defendants note, however, Plaintiff receives

23  these amenities "so long as these things do not jeopardize safety and security."  *Id.*

24        Defendants further allege that "the records show that [Plaintiff] received regular meals,

25  clothing, and linens" during his first six days in Ad Seg and cite to an exhibit filed with Attorney

26  Maiorino's declaration in support of Defendants' reply.  Dkt. 57 at 8; Dkts. 61, 61-1.  The Court

27  has examined the aforementioned exhibit, which is labeled Plaintiff's "Inmate Segregation

28  Record" from "1/2013 to "3/2013."  Dkt. 61-1 at 3.  The exhibit indicates that Plaintiff was

offered the following while he was at I.A.C. from January 12 through 18.  *Id.*  He received

breakfast, lunch and dinner from January 12 through 18.[18]  *Id.*  He was also offered trash disposal

each day.  *Id.*  On January 13, he was given toilet paper, soap, a toothbrush, ear plugs and paper.

*Id.*  Plaintiff was offered showers on January 13, 15, and 18; however, he refused to shower on

January 13.  *Id.*  On January 14, Plaintiff was offered tooth powder, pen filler, detergent, and a

bag, but no yard time.  *Id.*  Also on January 14, Plaintiff was offered clothing/linen; however, it is

unclear whether he accepted it or refused it.  *Id.*  Plaintiff was offered a chance to exercise on

January 17, but he refused.  *Id.*  Plaintiff was then moved to "regular" Ad Seg on January 18.  *Id.*

The exhibit shows further that once in "regular" Ad Seg, Plaintiff continued to receive

meals in the same manner as he did in I.A.C., although it is not clear if he received breakfast/lunch

on February 11 or February 29.  Dkt. 61-1 at 3-8.  Plaintiff received toilet paper and soap on a

regular basis and new clothing/linen three times during his 10 week stay in "regular" Ad Seg.  *Id.*

While Plaintiff received a toothbrush on February 26 and pen filler on January 24, February 26,

and March 26, he appears to have received tooth powder only on January 14, when he was still in

I.A.C.  *Id.*  He was also offered a chance to shower three times a week (which he never refused),

and a chance to exercise on a weekly basis, which he refused on February 8 and 19 as well as on

March 2, 6, 11, 19 and 27.  *Id.*

## II.      DISCUSSION

### A.      Legal Standard for Summary Judgment

Summary judgment is proper where the record shows there is no genuine dispute as to any

material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute to a material fact is genuine if there is sufficient

evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

---

[18] As mentioned above, Plaintiff claims he only received two meals a day while housed at I.A.C.  Dkt. 54 at 7.  According to his Inmate Segregation Record, Plaintiff received breakfast, lunch and dinner; however, it appears that breakfast and lunch could have been served at the same time each day.  Dkt. 60-1 at 4.  Moreover, Plaintiff only received dinner on January 12, presumably because he arrived at I.A.C. after breakfast/lunch was served.  Dkt. 60-1 at 3.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2       The moving party for summary judgment bears the initial burden of demonstrating the

3   absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 332 (1986).

4   Where the moving party will have the burden of proof on an issue at trial, it must affirmatively

5   demonstrate that no reasonable trier of fact could find other than for the moving party.  *Id.*  On an

6   issue where the opposing party will have the burden of proof at trial, however, the moving party

7   need only point out "that there is an absence of evidence to support the nonmoving party's case."

8   *Id.* at 325.

9       If the moving party meets its initial burden, the burden then shifts to the non-moving party

10  to present specific facts showing that there is a genuine issue for trial.  *Id* at 324; *Matsushita Elec.*

11  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  Self-serving affidavits may

12  establish a genuine issue of material fact as long as "they state facts based on personal knowledge

13  and are not too conclusory."  *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001).

14  Still, the Court may grant summary judgment when the nonmoving party's evidence is merely

15  colorable, or is not significantly probative.  *Liberty Lobby*, 477 U.S. at 249-50.

16      When there is a genuine dispute to the facts, the Court must view those facts "in the light

17  most favorable to the nonmoving party."  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).  But,

18  "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving

19  party, there is no genuine issue for trial." *Matsushita Elec.*, 475 U.S. at 587.  Finally, if the

20  nonmoving party fails to show a genuine issue of material fact, "the moving party is entitled to a

21  judgment as a matter of law."  *Celotex Corp.*, 477 U.S. at 323.

22      **B.    Evidence Considered**

23      A district court may only consider admissible evidence in ruling on a motion for summary

24  judgment.  *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

25  In support of Defendants' motion for summary judgment, declarations have been filed by

26  Defendants' Attorney Trace O. Mariano, Defendants Rodriguez, Seman, Erickson, as well as

27  SQSP Nurse J. Larsen.  Dkt. 44.  Plaintiff verified his amended complaint filed on April 28, 2014

28  by signing it under "penalty of perjury."  Dkt. 9 at 3.  On December 15, 2014, Plaintiff opposed

    the motion for summary judgment and filed a declaration in support of his opposition signed under

16

"penalty of perjury." Dkt. 54 at 11. Therefore, for the purposes of this Order, the Court will treat Plaintiff's amended complaint and his declaration as affidavits under Rule 56 of the Federal Rules of Civil Procedure. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

### C.   Legal Claims

#### 1.   Retaliation Claims

"Within the prison context, a viable claim of retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). To allege that retaliation occurred "because of" protected conduct, the plaintiff must show that "the protected conduct was a 'substantial' or 'motivating' factor in the defendants' decision." *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). The prisoner also bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains. *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). At that point, the burden shifts to the prison official to show, by a preponderance of the evidence, that the retaliatory action was narrowly tailored to serve a legitimate penological purpose. *See Schroeder*, 55 F.3d at 461-62.

Prisoners may not be retaliated against for exercising their right of access to the courts. *See id.* at 461. The right of access to the courts extends to established prison grievance procedures. *See Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995) *abrogated on other grounds by Shaw v. Murphy*, 532 U.S. 223 (2001). Thus, a prisoner may not be retaliated against for using such procedures. *See Rhodes*, 408 F.3d at 567.

Retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'" *Pratt*, 65 F.3d at 807 (quoting *Sandin v. Conner*, 515 U.S. 472, 482 (1995)). In particular, courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for

United States District Court
Northern District of California

1    conduct alleged to be retaliatory." *Id.* (quoting *Sandin*, 515 U.S. at 482).

2             **a.**     **Retaliation as Punishment for Exercising Right to Remain Silent**

3          In its Order of Service, the Court found that Plaintiff raised a cognizable retaliation claim

4    against Defendants for exercising his Fifth Amendment right to remain silent.  Dkt. 12 at 2.

5    Specifically, Plaintiff alleged that Defendants placed him in Ad Seg because he refused to admit

6    that his injuries resulted from a fight or provide the name of his supposed attacker.  Dkt. 9 at 4-5.

7    Defendants maintain that Plaintiff's injuries suggested he was the "victim of an assault" and that

8    they placed him in Ad Seg for his own safety, not as an act of retaliation.  Dkt. 44 at 10-11; Seman

9    Decl., Dkt. 44-2 at 4; Erickson Decl., Dkt. 44-3 at 4.

10         The Fifth Amendment, which applies to the States through the Fourteenth Amendment,

11   *Malloy v. Hogan,* 378 U.S. 1 (1964), provides that "no person . . . shall be compelled in any

12   criminal case to be a witness against himself."   U.S. Const. amend. V.  To qualify for the Fifth

13   Amendment privilege against self-incrimination, a communication must be testimonial,

14   incriminating, and compelled.  *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cnty.*,

15   542 U.S. 177, 189 (2004).   To be testimonial, a communication must relate a factual assertion or

16   disclose information.  *Id.* (citing *Doe v. United States*, 487 U.S. 201, 210 (1988)).  Under the

17   incriminating requirement, the Fifth Amendment "protects against any disclosures that the witness

18   reasonably believes could be used in a criminal prosecution or could lead to other evidence that

19   might be so used." *Hiibel*, 542 U.S. 177, 189 at 190 (citing *Kastigar v. United States,* 406 U.S.

20   441, 445 (1972)).  The privilege extends not only to criminal proceedings, but any proceeding in

21   which the answers might incriminate the individual in future criminal proceedings.  *Neal v.*

22   *Shimoda*, 131 F.3d 818, 832 (9th Cir. 1997) (citing *Allen v. Illinois*, 478 U.S. 364, 368 (1986));

23   *see also Baxter v. Palmigiano*, 425 U.S. 308, 316 (1976) (inmates in prison disciplinary

24   proceedings who are compelled to offer testimony that may be used against them in future

25   criminal proceedings must be offered immunity).  However, there must be a "real probability" that

26   the State would use the admissions against the individual in a future criminal proceeding.  *See*

27   *Neal*, 131 F.3d at 833.  A remote and speculative possibility that the State will use the admissions

28   is insufficient.  *Id.*

United States District Court
Northern District of California

1      Here, Plaintiff's potential communication to staff concerning the details of his supposed

2  fight and naming his alleged attacker qualifies as testimonial information.  However, Plaintiff has

3  not alleged a real possibility that he could have been prosecuted.  First, he claims that "there was

4  no fight."  Dkt. 9 at 4.  If that indeed is the case, then there is no possibility of future prosecution,

5  and thus no possibility of an incriminating statement.  Under such circumstances, the Fifth

6  Amendment privilege against self-incrimination does not apply.  Second, Plaintiff claims that

7  hypothetically, had there been a fight, he "could not talk about it."  *Id.* at 4.  Plaintiff appears to be

8  concerned with being labeled as a "snitch" and thus becoming a target in general population.  *Id.*

9  at 6.  But again, the Fifth Amendment privilege only applies to future *prosecutions*.  It does not

10  apply to the possibility of any future harm.  Plaintiff has not alleged that hypothetically disclosing

11  the details of alleged fight would subject him to criminal proceedings.  On the contrary, because

12  prison officials believed Plaintiff was the victim and not the aggressor of the alleged altercation,

13  any future prosecution would be a remote and speculative possibility.  Furthermore, the record

14  confirms that Plaintiff was neither subjected to a disciplinary violation nor criminal prosecution.

15  *See* Erickson Decl., Dkt. 44-3 at 3.  Finally, Plaintiff never made a statement that could possibly

16  be used against him.  As such, the record shows that Plaintiff's Fifth Amendment rights were

17  never implicated in this incident.

18      Having viewed the evidence in the light most favorable to Plaintiff, the Court finds that he

19  has failed to produce specific evidence to show that a genuine issue of material fact exists

20  regarding his retaliation claim against Defendants for exercising his Fifth Amendment right to

21  remain silent.  Therefore, the Court GRANTS Defendants' motion for summary judgment as to

22  this claim.

23      **b.  Retaliation as Punishment for "Filing" a Grievance**

24      Plaintiff also alleges that prison officials placed him in Ad Seg as "a retaliatory measure

25  meant to punish [him] for filing a claim on an unrelated incident."  Dkt. 9 at 4.  Plaintiff indicates

26  that this "claim" or grievance arose out an incident involving Correctional Officer Clain that

27  occurred on January 11, 2013, the day before his encounter with Defendant Seman.  *Id.*  Defendant

28  Seman declares, however, that he was unaware that Plaintiff had filed such a grievance and

emphasizes that the decision to place Plaintiff in Ad Seg was not retaliatory, but out of concern for Plaintiff's safety.  Seman Decl., Dkt. 44-2 at 4.

To reiterate, Plaintiff alleges that he was placed in Ad Seg on January 12, 2013 as punishment for "filing" a grievance on an incident that occurred on January 11, 2013.  Dkt. 9 at 4. But according to the exhibits attached to the original complaint, Plaintiff did not file the relevant grievance form, or 602 inmate appeal, until February 4, 2013.  *See* Dkt. 1-1 at 3.  Thus, Plaintiff's contention is contradicted by the record because Defendants could not have retaliated against him on January 12, 2013 for a grievance that was filed on February 4, 2013.

The Court, in viewing the facts in the light most favorable to Plaintiff, recognizes that Plaintiff may argue that although he did not file his grievance on January 11, he made known his intention to do so on that date.  Specifically, Plaintiff would have to argue that not only did he voice his intention to file a grievance on the afternoon of January 11, but that Defendant Seman was informed of this intention sometime before his encounter with Plaintiff on the morning of January 12 (*see* dkt. 9 at 4).  Additionally, Plaintiff would have to allege that Defendant Seman placed Plaintiff in Ad Seg based on this supposed intention to file a grievance.  The Court finds this quite improbable given the timing of the events and Defendant Seman's declaration that he was unaware of any claim Plaintiff had made.  *See* Seman Decl., Dkt. 44-2 at 4.  Therefore, the Court finds that Plaintiff has failed to show a triable issue of fact that Defendants retaliated against him for filing or expressing an intention to file a grievance.

Under *Rhodes*, Plaintiff has failed to show that the adverse action he suffered was because of his protected conduct.  Further, the only non-speculative assertion which Plaintiff could rely upon to link his conduct to Defendants' adverse action of placing him in Ad Seg is that the Ad Seg placement occurred the day after Plaintiff expressed his desire to file such a grievance.  But retaliation is not established simply by showing adverse activity by a defendant after protected speech; rather, the plaintiff must show a nexus between the two.  *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc*, i.e., "after this, therefore because of this").  Plaintiff has not shown a nexus here.

Additionally, even if Plaintiff could show he was placed in Ad Seg as retaliation for

exercising protected conduct, he cannot show that Defendants' actions did not reasonably advance the legitimate penological goal of ensuring Plaintiff's safety, as well as that of his fellow inmates, and prison staff. Therefore, Plaintiff has not carried his burden of pleading and proving the last *Rhodes* factor—that his Ad Seg placement did not reasonably advance a legitimate correctional goal.

Having viewed the evidence in the light most favorable to Plaintiff, the Court finds that he has failed to produce specific evidence to show that a genuine issue of material fact exists as to his retaliation claim against Defendants for allegedly placing him in Ad Seg as punishment for "filing" a grievance. Therefore, the Court GRANTS Defendants' motion for summary judgment as to this claim.

### 2. Fourteenth Amendment Due Process Claims

Under the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. State statutes and prison regulations may grant prisoners liberty interests that invoke due process protections. *Meachum v. Fano,* 427 U.S. 215, 223-27 (1976). *Toussaint v. McCarthy* held that Sections 3335 and 3336 of Title 15 of the California Code of Regulations create a liberty interest in freedom from arbitrary segregation. 801 F.2d 1080, 1097-98 (9th Cir. 1986) *overruled in part on other grounds by Sandin*, 515 U.S. 472. However, the United States Supreme Court in *Sandin*, articulated a new requirement for recognizing federal due process liberty interests of inmates subject to administrative segregation. 515 U.S. at 484. Specifically, the decision to place and retain a prisoner in administrative segregation must comport with procedural due process only if the specific deprivation constitutes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

When a prisoner is placed in administrative segregation, prison officials must, within a reasonable time after the prisoner's placement, conduct an informal, non-adversary review of the evidence justifying the decision to segregate the prisoner. *See Hewitt*, 459 U.S. at 476. The Supreme Court has stated that five days is a reasonable time for the post-placement review. *See id.* at 477. Before the review, the prisoner must receive some notice of the charges and be given

United States District Court
Northern District of California

United States District Court
Northern District of California

1    an opportunity to respond to the charges.  *See id.* at 476.  There also must be "some evidence" to

2    support the decision to segregate a plaintiff for administrative reasons, *Toussaint*, 801 F.2d at

3    1104-05 (citing *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)), and the evidence relied upon

4    must have "some indicia of reliability," *Madrid v. Gomez*, 889 F. Supp. 1146, 1273-74 (N.D. Cal.

5    1995).  Due process does not require detailed written notice of charges, representation by counsel

6    or counsel-substitute, an opportunity to present witnesses, a written decision describing the

7    reasons for placing the prisoner in administrative segregation or disclosure of the identity of any

8    person providing information leading to placement of a prisoner in administrative segregation.

9    *See Toussaint*, 801 F.2d at 1100-01.

10          Following placement in administrative segregation, prison officials must engage in some

11   sort of periodic review of the inmate's confinement.  *See Hewitt*, 459 U.S. at 477 n.9; *Toussaint*,

12   801 F.2d at 1101.  Due process is satisfied if the decision to segregate the inmate is reviewed by

13   prison officials every 120 days, *see Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990),

14   *cert. denied*, 502 U.S. 874 (1991), and the review amounts to more than "meaningless gestures,"

15   *see Toussaint v. Rowland*, 711 F. Supp. 536, 540 n.11 (N.D. Cal. 1989) (citing *Toussaint v.

16   McCarthy*, 801 F.2d at 1102).

17          In the instant action, Plaintiff's deprivation—two and a half months in Ad Seg—suggests

18   sufficient severity to implicate procedural due process protection.  *Compare Richardson v.

19   Runnels*, 594 F.3d 666, 672 (9th Cir. 2010) (sixteen days in Ad Seg did not constitute atypical and

20   significant hardship in relation to the ordinary incidents of prison life); *Mujahid v. Meyer*, 59 F.3d

21   931, 932 (9th Cir. 1995) (same, fourteen days in Ad Seg).  Assuming Plaintiff's two-and-a-half

22   months in Ad Seg constitutes an "atypical and significant hardship," the Ninth Circuit has held

23   that Plaintiff was entitled to the following aforementioned procedures: (1) an informal non-

24   adversary hearing within a reasonable time after being segregated, (2) notice of the charges or the

25   reasons segregation is being considered, and (3) an opportunity to present his views.  *See

26   Toussaint*, 801 F.2d at 1100.

27          First, the ICC held an initial hearing on January 17, 2013—within *five days* of Plaintiff's

28   January 12, 2013 placement in Ad Seg, dkt. 44 at 14; dkt. 44-7 at 7, and thus he was given a

1    hearing within a "reasonable time." *See Hewitt*, 459 U.S. at 477.  Still, Plaintiff contends that he

2    "was yelled at" and that he did not receive a "fair hearing." Dkt. 9 at 5.  Plaintiff also disagrees

3    with the ICC's hearing notes, which stated that he "was an active participant in the hearing" and

4    he "was in agreement with the committee decision." Dkt. 54 at 4.  Plaintiff maintains that he was

5    not in agreement with the committee, and that he was not given a copy of the decision, which he

6    needed to appeal.  *Id.*  While Plaintiff claims the hearing record falsely noted that he was in

7    agreement with the decision, he concedes that he was indeed present at the hearing.  Dkt. 9 at 5;

8    Dkt. 54 at 3-4.  Even taking the evidence in the light most favorable to Plaintiff by assuming that

9    the hearing record was false, it matters not that he was prevented from actively participating or

10   that he disagreed with the committee's decision because Plaintiff's presence at the hearing is not

11   required to satisfy due process.  *See Hewitt*, 459 U.S. at 476 (While the prisoner's attendance at an

12   administrative segregation hearing is potentially "more useful," it is not constitutionally required.).

13   Furthermore, even though Plaintiff argues he was not given a written decision describing the

14   reasons for his Ad Seg placement, he is not entitled to such a written decision under *Toussaint*.

15   801 F.2d at 1100-01.  Therefore, without more specificity, the Court finds that Plaintiff cannot

16   establish that the initial ICC hearing violated his due process rights under *Toussaint*.  Furthermore,

17   Plaintiff was afforded two reviews of his placement in Ad Seg—once on February 28, 2013 and

18   again on March 28, 2013, the date he was released from Ad Seg.  Dkt. 9 at 5; Dkt. 54 at 4; Dkt.

19   44-7 at 12; Dkt. 44 at 8.  During the February 28, 2013 hearing, the committee informed Plaintiff

20   that it elected to retain him in Ad Seg for another sixty days "pending unit investigation."  Dkt.

21   44-7 at 8.  While Plaintiff argues that no such investigation took place, the Court finds that the

22   committee's reason amounts to more than a "meaningless gesture[]," *Toussaint*, 801 F.2d at 1102,

23   and thus complies with due process requirements.

24           Second, Defendant Seman informed Plaintiff of the reasons for his placement in Ad Seg

25   and gave him a copy of the notice that listed those reasons.  Seman Decl., 44-2 at 3; Dkt. 44-7 at 4.

26   Although Plaintiff claims that Defendant Seman warned Plaintiff that "he would be placed in [Ad

27   Seg] unless he told whom he had fought with," the notice signed by Defendant Seman on January

28   12, 2013 indicates Plaintiff was transferred for "safety concerns."  Dkt. 9 at 4; Dkt. 44-7 at 4.

United States District Court
Northern District of California

1    Defendant Erickson also informed Plaintiff that he was placed in Ad Seg for "safety concerns."

2    Erickson Decl., Dkt. 44-3 at 2.  Plaintiff even wrote on the notice form, which proves that he was

3    advised of the reasons for his Ad Seg placement.  *See* Dkt. 44-7 at 6.  While Plaintiff might have

4    disagreed with the proffered reasons and challenged their truthfulness, he nevertheless received

5    adequate notice of those reasons, which is sufficient under *Toussaint*.  *See* 801 F.2d at 1100-01

6    (prisoner not entitled to detailed notice of charges); *see also Hewitt*, 459 U.S. at 476 (prisoner must

7    receive some notice of charges and be given opportunity to respond).

8            Third, Plaintiff had numerous opportunities to present his views.  Plaintiff admits that he met

9    with Defendant Seman and Defendant Erickson on separate occasions regarding his Ad Seg

10   placement.  Dkt. 9 at 4-5; Dkt. 54 at 1, 3.  Plaintiff makes clear that he expressed his views to both

11   Defendant Seman and Defendant Erickson, and that he spoke and asked questions during his ICC

12   hearing on February 28th.  *See* Dkt. 9 at 5; Dkt. 54 at 4.  Additionally, Plaintiff states that he

13   expressed his Ad Seg concerns to Lieutenant Lee.  Dkt. 9 at 6; Dkt. 54 at 5.  While Plaintiff might

14   allege that prison officials rejected his views, he cannot claim he was denied to the opportunity to

15   express those views.  Thus, the Court finds that Plaintiff was given ample opportunity to express

16   his views regarding his placement in Ad Seg.

17           Also, Defendants' decision to place Plaintiff in Ad Seg was supported by "some evidence,"

18   *Toussaint*, 801 F.2d at 1104-05, and that evidence had "some indicia of reliability," *Madrid*, 889

19   F. Supp. at 1273-74.  First, prison staff observed Plaintiff with physical injuries that included

20   bleeding, abrasions, redness, and swelling on his face, chest, back and knuckles.  Seman Decl.,

21   Dkt. 44-2 at 2; Dkt. 44-5 at 2.  Even if prison staff accepted Plaintiff's assertion that he did not

22   have marks on his hands consistent with fighting, *see* dkt. 54 at 2, the remaining injuries raised

23   significant concern for Plaintiff's safety.  Also, although Plaintiff claimed that he fell out of his

24   bunk, prison staff believed that his injuries were not consistent with such a fall.  Dkt. 44 at 18;

25   Seman Decl., Dkt. 44-2 at 2; Erickson Decl., Dkt. 44-3 at 2.  Furthermore, prison staff could not

26   locate any witnesses to the alleged fall, and Plaintiff made statements that he did not want to be

27   a "snitch" or "point the finger."  Seman Decl., Dkt. 44-2 at 2; Erickson Decl., Dkt. 44-3 at 2, 4;

28   Larsen Decl., Dkt. 44-4; Dkt. 9 at 4, 6.  Thus, even while viewing the facts in the light most

United States District Court
Northern District of California

favorable to Plaintiff, the Court finds that Defendants relied upon "some evidence" to conclude that Plaintiff's safety was at risk before they placed him in Ad Seg as a necessary precaution. Moreover, based on prison staff's examination of Plaintiff's injuries and his statements regarding not wanting to be a "snitch," *see* Larsen Decl., dkt. 44-4, the Court finds Defendants based their conclusions on evidence that had "some indicia of reliability," *Madrid*, 889 F. Supp. at 1273-74.

In sum, based on its analysis above, the Court finds that Plaintiff's placement and retention in Ad Seg complied with the due process required under *Toussaint*. Therefore, Plaintiff has not presented facts which raise any triable issue as to whether his placement and retention in Ad Seg for two and a half months violated due process.

To the extent that Plaintiff attempts to establish a due process violation by alleging mishandling of his inmate appeals challenging his Ad Seg placement, his arguments are unavailing. A prison official's failure to process grievances, without more, is not actionable under section 1983. *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993); *see also Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (holding that prisoner's claimed loss of a liberty interest in the processing of his appeals does not violate due process because prisoners lack a separate constitutional entitlement to a specific prison grievance system). Here, Plaintiff alleges that his 602 appeals were mishandled, but concedes that one of his 602 appeals—log no. CSQ-B-13-00521—"made it through the screening process," and that he eventually received a "hearing." Dkt. 9 at 6. As explained above, Plaintiff pursued log no. CSQ-B-13-00521 to the TLR, where it was denied because Appeals Examiner Pool found that no relief was warranted at that level. Dkt. 9 at 24. Because these claims are not actionable, the Court finds Plaintiff has not presented facts which raise any triable issue as to whether Defendants' alleged mishandling of his 602 appeals violated due process.

Accordingly, Defendants' motion for summary judgment is GRANTED as to Plaintiff's due process claims.

### 3. Eighth Amendment Claim

The Eighth Amendment forbids "cruel and unusual punishments." U.S. Const. amend. VIII. But, the "transfer of an inmate to less amenable and more restrictive quarters for non-

United States District Court
Northern District of California

1   punitive reasons is well within the terms of confinement ordinarily contemplated by a prison

2   sentence." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983) *overruled on other grounds by Sandin*, 515

3   U.S. 472.  Additionally, an indeterminate stay in administrative segregation, without more, does

4   not constitute cruel and unusual punishment in violation of the Eighth Amendment.  *See Anderson*

5   *v. County of Kern*, 45 F.3d 1310, 1315-16 (9th Cir. 1995) (no contact with any other inmate in

6   administrative segregation, either for exercise, day room access or otherwise not cruel and unusual

7   punishment), *cert. denied*, 516 U.S. 916 (1995).

8            On the other hand, a prison official violates the Eighth Amendment when two

9   requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the

10  prison official possesses a sufficiently culpable state of mind.  *Farmer v. Brennan*, 511 U.S. 825,

11  834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 297-98 (1991)).  Under the objective

12  requirement, substantial deprivations of shelter, food, drinking water, or sanitation for four days

13  are sufficiently serious to satisfy an Eighth Amendment claim.  *Johnson v. Lewis*, 217 F.3d 726,

14  732-33 (9th Cir. 2000); *County of Kern*, 45 F.3d at 1314, ("[A] lack of sanitation that is severe or

15  prolonged can constitute an infliction of pain within the meaning of the Eighth Amendment."),

16  *opinion amended on denial of reh'g,* 75 F.3d 448 (9th Cir. 1995).  Also, continuous lighting that

17  causes sleep deprivation and psychological problems may give rise to an Eighth Amendment

18  claim.  *Keenan v. Hall*, 83 F.3d 1083, 1090-91 (9th Cir. 1996); *but see Chappell v. Mandeville*,

19  706 F.3d 1052, 1053 (9th Cir. 2013) (*Keenan* did not clearly establish that constant illumination

20  violates Eighth Amendment when done for the legitimate penological purpose of performing

21  contraband watch).

22           Here, taking the facts in the light most favorable to Plaintiff, his allegations that he was

23  denied food, showers, exercise, and hygiene products, and that he was constantly exposed to light

24  and sound may be sufficiently serious to constitute deprivations under the Eighth Amendment.

25  However, Plaintiff specifically claims that he experienced most of the aforementioned

26  deprivations only temporarily—during the first six days when he was in I.A.C. from January 12,

27

28

                                                      26

United States District Court
Northern District of California

1   2013 through January 18, 2013.[19]  Thus, the Court finds that under established federal law

2   Plaintiff has not presented a triable issue of fact as to whether the conditions in I.A.C. during those

3   six days establish an Eighth Amendment violation because many courts have concluded that such

4   temporary deprivations are not sufficiently serious to support an Eighth Amendment claim.  *See*

5   *e.g. Mandeville*, 706 F.3d at 1058, 1060-61 (deprivation of bedding for seven days did not violate

6   Eighth Amendment); *Centeno v. Wilson*, 2011 WL 836747 (E.D. Cal. Mar. 4, 2011) (sleeping on

7   cold floor without mattress or blanket for seven days did not violate Eighth Amendment), *aff'd by*

8   *Centeno v. Wilson*, 479 Fed. Appx. 101 (9th Cir. 2012) (unpublished); *Anderson*, 45 F.3d at 1314

9   (temporary placement in safety cell that was dirty and smelled bad did not constitute Eighth

10  Amendment violation); *Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996) (no constitutional

11  violation where pretrial detainee subjected to overflowed toilet for four days); *May v. Baldwin*,

12  109 F.3d 557, 565-66 (9th Cir. 1997) (temporary twenty-one day denial of outdoor exercise, with

13  no medical effects is not a substantial deprivation under the Eighth Amendment).  As to Plaintiff's

14  remaining allegations related to deprivations while he was held in "regular" Ad Seg for the

15  remaining two-and-a-half month period until his release on March 28, 2013, the Court finds that

16  Plaintiff has not presented any evidence to raise a triable issue of fast as to whether the alleged

17  deprivations came anywhere near amounting to cruel and unusual punishment, so as to establish

18  an Eighth Amendment violation.  *Cf. Madrid*, 889 F. Supp. at 1227-30, 1260-65 (overall harsh

19  conditions of Pelican Bay State Prison's Security Housing Unit do not violate the Eighth

20  Amendment for the non-mentally ill inmates therein).

21          Furthermore, under the second requirement, Plaintiff must show that prison officials

22  possessed a sufficiently culpable state of mind in depriving him, meaning that they treated him

23  with "deliberate indifference."  *Farmer*, 511 U.S. at 834.  To satisfy the deliberate indifference

24  standard, prison officials must not only "be aware of facts from which the inference could be

25  drawn that a substantial risk of serious harm exists," but "must also draw the inference."  *Id.* at

26

27          [19] As mentioned above, Defendants offered Plaintiff's Inmate Segregation Record to show
    that he did receive regular meals, clothing, and linens during his first six days in I.A.C.  Dkt. 57 at
28  8; Dkts. 60, 60-1.  However, for the purposes of this analysis, the Court takes the facts in the light
    most favorable to Plaintiff, as mentioned above.

837. The prisoner "need not show that a prison official acted or failed to act believing that harm would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (citation omitted).

As to the subjective component, the Court finds that Plaintiff has not presented facts which raise any triable issue as to whether Defendants were deliberately indifferent to his safety or well-being. At a minimum, in order to show this component, Plaintiff must identify specific individuals who were deliberately indifferent to his safety and well-being. No such showing has been made. Additionally, while Plaintiff complains of the conditions in Ad Seg, he does not allege that any of the named defendants were responsible for depriving him of food, showers, or hygiene products, or exposing him to obtrusive light and sound. In fact, Plaintiff does not allege that any particular prison official imposed such deprivations. Thus, Plaintiff fails to raise a triable issue of fact that any prison official acted with the requisite knowledge that Plaintiff faced substantial risk or serious harm due to the described deprivations. Therefore, the Court GRANTS Defendants' motion for summary judgment as to Plaintiff's Eighth Amendment claim.

In sum, based on the above analysis, the Court finds that no reasonable trier of fact could find other than for Defendants on Plaintiff's aforementioned claims. First, Plaintiff has failed to raise a triable issue of fact regarding his retaliation claim against Defendants for placing him in Ad Seg as punishment for invoking his right to remain silent or for "filing" a grievance. Second, Plaintiff has failed to raise a triable issue of fact that he was denied due process in being placed and retained in Ad Seg. Finally, Plaintiff has failed to raise a triable issue of fact that the treatment he endured in Ad Seg violated the Eighth Amendment. Because Plaintiff has failed to demonstrate a genuine dispute of material fact on these issues, Defendants' motion for summary

United States District Court
Northern District of California

judgment is GRANTED as to all claims.[20]

The Court notes that Magistrate Judge Lloyd did not address in his Order of Service whether Plaintiff had raised any cognizable state law claims in his amended complaint. Dkt. 12. However, at this time the Court is disposing of all federal claims; therefore, the Court would not be able to exercise supplemental jurisdiction over such state law claims even if they were cognizable. If Plaintiff wishes to raise any state law claims stemming from his January 12, 2013 placement in Ad Seg, then he may proceed with his state law claim in state court. *Cf. Reynolds v. County of San Diego*, 84 F.3d 1162, 1171 (9th Cir. 1996) (dismissal of pendent state claims following dismissal of federal claims must be without prejudice).

## CONCLUSION

For the reasons outlined above, the Court orders as follows:

1.      Plaintiff's motions for reconsideration and appointment of counsel are DENIED. Dkts. 27, 47.

2.      Defendants' motion for summary judgment is GRANTED as to all claims. Dkt. 44.

3.      The Clerk shall enter judgment, terminate all pending motions, and close the file.

4.      The Clerk shall also send Plaintiff's copy of this Order to SQSP and to the California Substance Abuse Treatment Facility and State Prison in Corcoran. *See supra* note 2.

5.      This Order terminates Docket Nos. 27, 44, and 47.

IT IS SO ORDERED.

Dated:  July 29, 2015

_____
YVONNE GONZALEZ ROGERS
United States District Judge

_____

[20] The Court's finding that Defendants are entitled to summary judgment as a matter of law obviates the need to address Defendants' alternative arguments regarding causal connection of the alleged harm to certain Defendants as well as their entitlement to qualified immunity.